CHAUTAUQUA   COUNTY.—HON. DANIEL   SHERMAN, SURROGATE.—April, 1887.

MATTER OF DORMAN.

*In the matter of the application for probate of a paper propounded as the will of* DEARING DORMAN, *deceased.*

Decedent, who was one of the first settlers in the town of Sherman, Chautauqua county, with the aid of his twelve children by his first wife, cleared up and paid for a valuable farm of 359 acres. Two years after her death in 1866, and when of the age of 71 years, he married his second wife, by whom he had no children, and to whom, by his will executed in 1876, he gave all his property. He died in 1884, aged 87 years. Soon after his marriage to his second wife, he took great apparent dislike to his children, and, during several years before making his will and until his death, he habitually, without apparent cause, denounced them as robbers and thieves, and declared that not one of them should have any of his property; at such times manifesting great excitement and refusing to be reasoned with on the subject. He was naturally of a nervous temperament, positive in his opinions and emphatic in his manner of expressing them; on other subjects than his children, his manner and conversation were usually mild and reasonable, and in matters not relating to them he was rational and transacted business with good judgment and discretion. Upon application for probate of his will,—

*Held,* that the decedent, at the time of making the same was a monoma-

niac, acting under the insane delusion that his children were his ene-
mies conspiring to rob him of his property, leading him to disown
them as his children, and to disinherit them from any share in his
property which they had assisted him in accumulating ; and, such
tendency and delusion having been aggravated by the undue influence
of the beneficiary, that the application should be denied.

APPLICATION for probate of will.  The facts are stat-
ed in the opinion.

H. C. KINGSBURY, *for proponent.*

JOHN S. LAMBERT, *for contestants.*

THE SURROGATE.—Dearing Dorman died Nov. 29th,
1884, aged 87 years, leaving him surviving Mary E.
Dorman, widow by his second marriage, six sons, five
daughters and two minor grandchildren of his young-
est deceased son, being his heirs at law by his first
wife who died intestate in 1866.  He had no children
by his second wife.  Mr. Dorman was one of the pio-
neer settlers of the town of Sherman, and was an
industrious, frugal and prosperous farmer.  He pur-
chased, cleared and paid for a farm of 359 acres which,
at the decease of his first wife, with whom he had
lived happily, was well stocked with cows and other
cattle.  His sons had assisted him in clearing up the
farm, and his daughters in the household work.

Soon after his marriage in 1868, to his second wife,
whose maiden name was Mary E. Horton, the deceas-
ed gave to his son Albert, who had married her sister,
an improved and valuable farm of 116 acres in Sher-
man, reserving the right to cut his fuel thereon dur-
ing life.  This was the only advancement he made to
any of his children.

Nearly eight years previously to his death, and

when of the age of 79 years, he made his alleged will, offered for probate, dated October 30th, 1876, by which he devised all his estate, real and personal, of the value of about $7,000, to his wife, Mary E. Dorman, by his second marriage, and appointed her executrix.

His youngest daughter, Adelaine, a girl in poor health and without pecuniary means, kept house for him from the death of his first wife until after his second marriage. None of his children lived in his family after Adelaine left; his household afterwards consisting of himself and the beneficiary, who had one daughter by a former husband. The cause of Adelaine's leaving home was some trouble with her step mother, and her father's unwillingness for her to remain. His children lived with him, working on the farm until of age, and some of them several years afterwards.

He claimed that his children were opposed to the second marriage, and after the death of his first wife in 1868, and before making his will in 1876, there was apparently a very marked change in his feelings towards all his children except Albert, and against him at times, so much so as to lead him to denounce them, in the public streets, stores and shops of the village where he lived, as robbers and thieves, usually introducing the subject himself, stating that he had no children, that they were all trying to rob him, which statements were untrue in fact; also stating that not one of them should ever have a cent of his property. On these occasions, extending through several years before and after making his will, his manner was

violent, his denunciations of all his children unspar-
ing, numerous witnesses testifying that the expres-
sion of his eyes on these occasions was wild, his face
flushed, and that his whole demeanor showed great
nervous excitement, and that this tendency increased
with his age. When speaking upon other subjects
than his children, his manner and conversation were
usually mild and reasonable, and in matters not relat-
ing to them he was rational, and transacted business
with good judgment and discretion. He was a man
of naturally nervous temperament, quite positive in
his opinions, earnest and emphatic in his manner of
expressing them.

Immediately previously to making his will, he ex-
pressed his intention of deeding his property to his
wife, so that his children should not have any of it,
and on the day the will was made he went to an at-
torney's office, unaccompanied by his wife, with the
intention of conveying his property to her by deed,
but being then advised not to allow his property to
pass from his control during life, he instead executed
the will in question; and afterwards, on the same day,
called a neighbor into his house, when Mrs. Dorman,
the beneficiary, commenced the conversation by say-
ing: " We have got them devils fixed," referring to
the will and her husband's children; to which the tes-
tator replied: " Yes I have willed every thing I have
got to that woman who sits there," referring to the
beneficiary.

On the occasions mentioned, before and after mak-
ing his will, when denouncing his children as robbers
and thieves, and as trying to rob him, and declaring

that they were not his children, when told by his neighbors and friends that his children were not robbers and thieves, that they were his children, and were not trying to rob him of his property, he usually refused to be reasoned with upon the subject, and growing excited and boisterous, denounced them more and more.

Some years before making his will, he purchased a house and lot in the village of Sherman, and moved there and resided until his death, renting his farm to others. He had some litigation with his son, Archibald, in 1870, and in 1879 with Albert, to whom he had given a farm, these sons in each case commencing the actions and not succeeding in either. This litigation with Archibald in 1870 might be a reason for disowning and denouncing him, but not for his continued and indiscriminate denunciation of his five daughters and other sons with whom he had had no personal difficulties.

I find from the evidence that Dearing Dorman at the time this will was made, October 30th, 1876, was not of sound and disposing mind; that he was a monomaniac on the subject of his children; that he had the insane delusion that they were his enemies and were combined against him to rob him of his property, leading him to disown them as his children and to disinherit them from any share in his property which they had assisted him in accumulating; and that such tendency and delusion were aggravated by the undue influence of the stepmother of his children.

That a man laboring under such delusion is incompetent to make a will relating to the subject of his

delusion and affected by it, although rational and competent to transact business upon other subjects, is a well established principle of law, sustained by numerous authorities (Matter of Shaw's will, 2 *Redf.*, 107; Lathrop v. Borden, 5 *Hun*, 560; Stanton v. Wetherwax, 16 *Barb.*, 259; Seaman's Friend society v. Hopper, 33 *N. Y.*, 619; Morse v. Scott, 4 *Dem.*, 507; *In re* McCue, 17 *Week. Dig.*, 501; Riggs. v. Am. Tract Soc., 95 *N. Y.*, 503).

I, therefore, dismiss the proceeding for its probate.